IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

J. C. BRADFORD & COMPANY,
a Tennessee Limited Liability
Company,

       Plaintiff-Appellant,

Vs.

SOUTHERN REALTY PARTNERS,
a Tennessee General Partnership,
and WESTON MANAGEMENT
COMPANY, A Delaware Corporation,

       Defendants-Appellees.

FILED

**December 10, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

Shelby Chancery No. 107339-3
C.A. No. 02A01-9801-CH-00006

FROM THE SHELBY COUNTY CHANCERY COURT
THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR

Carl H. Langschmidt, Jr.; Bobby M. Leatherman; Parke S. Morris;
Armstrong Allen Prewitt Gentry Johnston & Holmes, PLLC, of Memphis
For Appellant

J. Alan Hanover; James R. Newsom III;
Hanover, Walsh, Jalenak & Blair, PLLC, of Memphis
For Appellee, Southern Realty Partners

Martin W. Brown of Memphis
For Appellee, Weston Management Company

*VACATED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.**

CONCUR:

**ALAN E. HIGHERS, JUDGE**

**DAVID R. FARMER, JUDGE**

       This is a case involving allegations of fraudulent and negligent misrepresentation and

violation of the Tennessee Consumer Protection Act. Plaintiff, J.C. Bradford & Co. (Bradford),

appeals from the trial court's decree dismissing its complaint and awarding judgment on the

counterclaims of defendants, Southern Realty Partners (Southern) and Weston Management Company (Weston).

In late 1993, Bradford began negotiations with Weston, who was acting as agent for Southern, to lease a building in Memphis. The agreement in final form required Southern to build an office building to fit Bradford's needs in exchange for a ten (10) year lease. During the lease negotiations, Bradford agreed to an "expense stop" of $4.35 per square foot, and this is the subject of the dispute between the parties.

An "expense stop" is the maximum amount of the operating expenses that the landlord agrees to pay.[1] In this case, the initial proposal required Southern to pay all operating expenses up to $4.50 per square foot. Bradford also wanted to cap the "expense stop" at a five (5%) percent increase after the first year. After lengthy negotiations, Weston would not agree to the cap on taxes, insurance, and utilities because it had no control over an increase in these costs. However, Weston did agree to a reduction in their management fee and base rent in exchange for reducing the "expense stop" to $4.35. This final proposal was accepted by Bradford, and according to the lease, if the operating expenses exceeded the "expense stop" Bradford would be required to pay the excess.

This dispute arises out of the negotiations concerning the "expense stop." Southern purchased the land upon which the office building in question is located to use as a speculative investment. It hired Weston as its agent to find a business to lease the land. In late 1993, David Peck (Peck), Weston President and CEO, contacted Bradford's Memphis area manager for the purpose of negotiating a build-to-suit office building on the land owned by Southern. After Bradford explained to Peck that it was interested in a one-story, residential style office building, Peck attempted to determine an estimate of the operating expenses for the completed project. He obtained information on the operating expenses of twelve other East Memphis office complexes, and attempted to adapt those numbers to the type of building that Bradford had requested. At that time, neither Bradford nor Weston knew the size nor specifications of the yet unplanned building.

Based upon his examination of operating expenses of the twelve buildings, Peck sent a

---

[1]Operating expenses in a lease such as this one include property taxes, utilities, insurance, garbage collection, janitorial service, etc.

2

written proposal to Bradford's Memphis area manager on January 6, 1994. The proposal stated, "[m]y best estimate for the operating expenses for the first twelve (12) months of occupancy will be $4.50 per square foot."[2] Both parties negotiated the terms of the lease, culminating in a final lease signed on March 28, 1994 that had both a lower base rent and an "expense stop" of $4.35.[3] Construction of the office building began on May 16, 1994, and the project was completed and Bradford moved in by December 1, 1994.

The first year operating expenses turned out to be $7.05 per square foot.[4] Because the operating expenses exceeded the "expense stop" by $2.70, Bradford owed Southern an extra $45,900 on the first year lease, and an estimated $500,000 over the entire term of the lease.[5]

After Weston sent it an invoice for the operating expenses exceeding the "expense stop," Bradford refused to pay and filed suit against Southern alleging fraud and negligent misrepresentation on the part of Peck, as an agent of Southern. Bradford claimed that Peck knew or should have known that operating expenses would be much higher than his estimation of the "expense stop." Initially, Bradford sought reformation of the lease by modifying the "expense stop" to a number much closer to actual expenses, and sought damages, and injunctive relief. The complaint also requested that Bradford be allowed to deposit the additional rent that was allegedly due under the lease into the court until the resolution of all disputes. The Chancellor granted Bradford's request that it be allowed to continue to occupy the building and permitted it to pay the additional rent into the court clerk's office. However, the trial court granted summary judgment on Bradford's prayer for reformation.[6] Bradford was allowed to amend the complaint to add a claim under the Tennessee Consumer Protection Act (TCPA). Bradford continued, and is presently, occupying the office building and paying the base rent to Southern.

Southern answered Bradford's amended complaint and specifically denied that its agent,

---

[2]A second more detailed written proposal was sent to Bradford on February 10, 1994 which once again stated that $4.50 per square foot was the best estimate of first year operating expenses.

[3] Weston agreed to lower the base rent and reduce its management fee by $.15 per square foot for a reduction in the "expense stop" from $4.50 to $4.35.

[4]The actual operating expenses exceeded the estimated "expense stop" primarily because of utilities and taxes. Taxes made up approximately 70% of the excess.

[5]The building was approximately 17,000 square feet in area. (17,000 * $2.70 = $45,000)

[6] No issue is presented concerning this action of the trial court.

Weston, made any misrepresentations concerning the "expense stop" and further claimed that Bradford did not justifiably rely on Peck's statements concerning the estimate of operating expenses. Southern also filed a counterclaim against Bradford alleging that it had defaulted by refusing and/or failing to pay the additional rent due under the lease. The counterclaim requested the court to award it the additional rent, interest, late fees, and attorneys' fees. Following Southern's counterclaim, Bradford joined Weston as a party to this lawsuit on November 15, 1996.

The parties appeared for trial without a jury on September 22, 1997. At the conclusion of rather extensive and somewhat convoluted opening statements, the Chancellor ruled from the bench that Bradford's complaint be dismissed, that Weston's counter-complaint for attorney fees in its own right be dismissed, and that judgment be awarded to Southern on its counter-complaint. Subsequently, after a hearing to determine the amount of Southern's attorney fees, the Chancellor entered a final decree in accordance with his prior ruling. Bradford has appealed and presents the following issues as stated in its brief:

> 1. Did the trial court err in failing to hold a trial?
>
> 2. Whether the facts as stipulated establish a claim for fraudulent misrepresentation, negligent misrepresentation, and/or a violation of the Tennessee Consumer Protection Act?
>
> 3. Whether the trial court improperly took judicial notice of a fact never stipulated to by the parties?
>
> 4. Whether the trial court improperly granted Southern attorneys' fees?

Weston also presents an issue for review of whether the trial court erred in denying an award of reasonable attorney fees and costs pursuant to Tennessee Consumer Protection Act, T.C.A. § 47-18-109 (e)(2) (1996).

We will now consider the issues.

FAILURE TO HOLD A TRIAL

Bradford asserts that the trial court erred by failing to hold a trial. Although Bradford relies upon a federal case from the Eleventh Circuit in support of its assertion that the trial court cannot voluntarily direct a judgment for a party following the party's opening statement, we believe it more appropriate to consider that proposition in light of the decision of our Supreme Court in *Harris v. Baptist Mem. Hosp.*, 574 S.W.2d 730 (Tenn. 1978). In *Harris,* a nurse's aide

sued the hospital for worker's compensation benefits, and the hospital counterclaimed seeking a setoff for the amount of sick benefits paid to the plaintiff. After opening statements of counsel, the trial court, *sua sponte,* dismissed the action. On appeal, the Supreme Court reversed stating:

> We are of the opinion, however, that the trial judges of this State are not authorized to order the involuntary dismissal of an action at trial upon the sole basis of the opening statements of counsel.
>
> * * *
>
> Of critical importance here is the nature of opening statements. They are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for evidence. See 75 Am.Jur.2d Trials § 202 (1974). It is easy to see that an involuntary dismissal upon the basis of the opening statements of counsel alone may effectively deny litigants the opportunity to be heard or to fully present the facts and evidence in the case. For this reason, we are unwilling to expand the provisions of Rule 41.02 to authorize trial judges to order involuntary dismissals upon opening statements only.

574 S.W.2d at 731-32.

Southern and Weston assert that the trial court did not direct judgment at the conclusion of opening statements, but considered the opening statements as stipulations of fact and rendered judgment based upon the stipulations of the parties. It is somewhat difficult to determine exactly what happened at the trial setting and illustrates that the Rules of Civil Procedure should be followed and cases tried in the usual and proper manner. As our Supreme Court said in *Harris*, the opening statements should be confined to outlining in a general way the nature of the case and the facts each party intends to prove. The case should then proceed as an evidentiary hearing in order for the trial court to make determinations including, of course, the credibility of witnesses. While oral stipulations are binding upon the parties and may be the basis of a ruling by the court, *Department of Highways v. Urban Estates, Inc.*, 465 S.W.2d 357, 360 (Tenn. App. 1971), there must be a clear understanding of what the stipulations are. While it would appear from some of the statements in the record that Bradford's counsel appeared to agree with the statements concerning these facts, he also added: "It's all in the documents." After the Chancellor stated his ruling, the following exchange took place:

MR. LEATHERMAN: Your Honor, under these facts here, I just,

5

as far as I am -- I am thinking on appeal here. And maybe we can work this out later, but I don't know how this will shake out. These statements that we have been making have come from various records and letters.

THE COURT: *You are going to introduce the records and letters to support all of that*, because I knew -- there is not going to be a problem about that.

MR. LEATHERMAN: Okay.

THE COURT: You gentlemen are men of honor among yourselves. And on top of that, each of you agreed with other most of the time, so there is not going to be a disagreement about where you got it from.

MR. HANOVER: I don't think there are any questions about any of the letters we talked about.

THE COURT: Or any of the points. You got some of this from someone's statements in depositions as well.

MR. LEATHERMAN: Right.

MR. HANOVER: That is true.

THE COURT: So ya'll are on the same wavelength as the Court, which is, y'all realize you may have differing opinions, but you understand that you can't have a different set of facts.

MR. HANOVER: I want to say this on behalf of Mr. Leatherman, and I am sure Mr. Brown will echo this: In my dealing with Mr. Leatherman since he has been in the case we have made a lot of agreements and I have never worried one minute about anything that he has said and I am sure that he hasn't worried about anything that I have said.

MR. BROWN: I would certainly second that.

MR. LEATHERMAN: The same goes for me.

THE COURT: And I am sure that will continue.

MR. LEATHERMAN: *Just for the record, we are going to be submitting deposition testimony and documents.*

THE COURT: *Absolutely, gentlemen. That is clearly -- I understood that when y'all told me some of the things you told me as facts*, they weren't because both of y'all had visions at the same time from on high. I know that it came from either demonstrative pieces of evidence, such as letters or appraisals, or that it came, which most of it I know came, from what you have told me, from depositions. So that is no problem whatsoever.

Emphasis added.

It appears from this exchange that the Chancellor recognized that further proof would be

forthcoming and authorized Bradford's counsel to file the proof for the record. Subsequently,

when Bradford's counsel filed various depositions and documents, Southern's counsel moved to strike the depositions. The trial court granted the motion, and the depositions were not made part of the record.

This development clearly illustrates the precarious nature of proceedings that do not conform to the rules of procedure. This case deals with allegations of fraud, intentional misrepresentation, negligent misrepresentation, and also issues concerning attorney fees pursuant to contract and pursuant to the Tennessee Consumer Protection Act. It is difficult to understand how the case could be tried without some consideration of witness credibility. Considering the nature of this case, this Court is of the opinion that complete justice cannot be had because of the defects in the record. *See* T.C.A. § 27-3-128 (1980).

Accordingly, the judgment of the trial court is vacated, and this case is remanded to the trial court for further proceedings as are necessary. Costs of the appeal are assessed one-half to appellant and one-half to appellees. The remaining issues are pretermitted.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**


_____
**ALAN E. HIGHERS, JUDGE**


_____
**DAVID R. FARMER, JUDGE**